UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
MARVIN L. MORRIS, JR.,                                       :    05 Civ. 04470 (RJH)
                                                             :
                            Plaintiff,                       :
                                                             :
       -against-                                             :
                                                             :
                                                             :
THE PEOPLE'S REPUBLIC OF CHINA, et al.,                      :
                                                             :
                            Defendants.                      :
                                                             :
-------------------------------------------------------------x
                                                             :
GLORIA BOLANOS PONS, et al.,                                 :    06 Civ. 13221 (RJH)
                                                             :
                            Plaintiffs,                      :
                                                             :
       -against-                                             :
                                                             :    **MEMORANDUM**
                                                             :    **OPINION AND ORDER**
THE PEOPLE'S REPUBLIC OF CHINA, et al.,                      :
                                                             :
                            Defendants.                      :
                                                             :
-------------------------------------------------------------x

   Consolidated plaintiffs Marvin L. Morris and Gloria Bolanos Pons and Aitor Rodriguez Soria bring actions against defendant People's Republic of China ("PRC") seeking to recover on defaulted bonds issued by the PRC's predecessor government in 1913. The PRC moves to dismiss Morris's complaint on the grounds that: (1) it is entitled to sovereign immunity and none of the exceptions enumerated in the Foreign Sovereign Immunities Act ("FSIA") are applicable; (2) the action is barred by the comprehensive settlement of existing claims of United States nationals against the PRC under the

International Claims Settlement Act[1] and a 1979 treaty between the two nations[2]; and (3) the statute of limitations has long since expired.  For the reasons that follow, the Court concludes that it lacks subject matter jurisdiction over Morris's complaint as the PRC is entitled to sovereign immunity, and further, that if jurisdiction existed, plaintiffs' claims would be time-barred.  The Court does not address whether plaintiffs' claims are also barred by the International Claims Settlement Act or the 1979 treaty.  If and when the PRC has been properly served in the *Pons* action, the Court will entertain further briefing on whether there are facts justifying a different conclusion than that reached herein.

## BACKGROUND

These actions represent part of a concerted effort by certain American citizens to collect almost $90 billion from the People's Republic of China for the failure of the PRC to pay the principal and interest on bonds issued in 1913 by the predecessor government of Yuan Shih-Kai.  The bondholders have formed the American Bondholders Foundation and are pursuing political, financial, and legal channels in their efforts to persuade the PRC to negotiate a settlement.  Asserting their rights as American citizens, plaintiffs insist that the PRC should be held to account for its economic commitments if it wishes to partake in international financial markets.

As fascinating as China's political history during the twentieth century may be, set forth in varying detail in the pleadings and moving papers, the Court will endeavor only to recount those facts necessary for the resolution of the motion before it.  In 1913, facing desperate financial conditions and mounting debt following the fall of the Qing Dynasty, the new Chinese government sought to raise capital through the issuance of bonds.  Under

---

[1] *See* 22 U.S.C. §§ 1622, 1643 (2006).
[2] Agreement Between the Government of the United States of America and the Government of the People's Republic of China Concerning the Settlement of Claims, May 11, 1979, 30 U.S.T. 1957.

the Chinese Government Reorganisation Loan Agreement ("Loan Agreement"), an international consortium of banks loaned the Republic of China £25,000,000 and in turn issued bonds for the value of the loan.[3] (Loan Agreement, Pietrzak Decl. Ex. 6; Bond, *id.* Ex. 1; Bond conditions (on reverse side of bond), *id.* Ex. 2.) The loan was secured by revenues from the Salt Administration of China and central government taxes on four specified Chinese provinces.[4] (Loan Agreement, Arts. IV, VI.)    The consortium of banks included banks from Britain, Germany, France, Russia, and Japan, but not America. Indeed, American banks withdrew from the consortium after President Woodrow Wilson refused to support their participation on the grounds that the terms of the loan imposed on China's sovereignty. (Statement of American Government in regard to Support requested by the American Group, March 18, 1913, Pietrzak Decl. Ex. 9.) Because America was excluded from the loan agreement, no American banks took part in the issuance of the bonds, loan payments by China were not paid to and loan proceeds not held by American banks, principal and interest payments were only redeemable at issuing banks and cities outside of America, and issuing banks could not transfer their interest in the loans to American companies. (Bond Condition ¶ 5; Loan Agreement, Arts. VIII, X, XIII, XIX.) However, issuing banks were not prohibited from issuing bonds to United States citizens. The Chinese government serviced and paid the debt for approximately twenty-six years. In

---

[3] The agreement provided for the interest to "be paid by the Chinese government . . . through the Banks or their designated agents," but the bonds also stated on their face that China "directly undertakes and engages to pay to the Bearer of this Bond" the amount owed. (*See* Loan Agreement, Arts. VIII, X, Pietrzak Decl. Ex. 6; Bond ¶ 1, *id.* Ex. 1.) The face of the bond further stated that the loan agreement was a "binding agreement upon the Government of the Republic of China, and its successors." (Bond preamble.)

[4] The PRC contends that the Loan Agreement, negotiated by foreign banks wishing to expand their home countries' political and economic influence in China, imposed onerous conditions on China. These included limiting China's ability to use the proceeds to defend itself against foreign interests, and requiring China to give foreigners official posts equal to their Chinese counterparts. It offers a commentator's view that "[t]he loan has been condemned by Chinese historians, nationalist and communist alike, as one of the ugliest crimes committed by the imperialist powers in China." K.C. Chan, *British Policy in the Reorganization Loan to China 1912–13*, 5 Mod. Asian Stud. 355, 355 (1971).

1939, the Chinese government ceased making interest payments on the bonds.  (Compl. ¶ 31.)  In 1949, after a revolution, the Communist Party of China founded the PRC.  The PRC made no interest payments, nor did it pay the principal when the bonds matured in 1960.[5]

Beginning in 1968 and spanning a year and a half, the Foreign Claims Settlement Commission set up under the International Claims Settlement Act of 1949 heard claims by U.S. nationals for losses resulting from the "nationalization, expropriation, intervention, or other takings" by the PRC from October 1, 1949 until November 6, 1966.  *See* 22 U.S.C. § 1643 (2006).  During a second claims period, the Commission heard claims arising from November 6, 1966 until May 11, 1979.  *See* 22 U.S.C. § 1623(a)(1)(B).  American citizens holding bonds, including the 1913 bonds at issue here, submitted claims to the Commission, although they were ultimately rejected.  The valuations of the claims established by the Commission were not finally resolved or paid until the United States and the PRC normalized diplomatic relations and reestablished bilateral economic and trade relations in 1979.  Under the treaty, the two nations reached a comprehensive settlement of all property claims of U.S. nationals against the PRC "arising from any nationalization, expropriation, intervention, and other taking . . . on or after October 1, 1949, and prior to the date of this Agreement [May 11, 1979]."  (Agreement Between the Government of the United States of America and the Government of the People's Republic of China Concerning the Settlement of Claims, May 11, 1979, 30 U.S.T. 1957, Pietrzak Decl. Ex. 4.)

---

[5] Defendant suggests that in 1955, a PRC government office issued a statement officially repudiating payment of any public bonds issued by "the Beiyang government and the Nationalist government."  (Pietrzak Decl. Ex. 11.)  However, it appears that defendant's English version of the document containing this quotation has been incorrectly translated, and that it actually states that the PRC was "unable to repay" the obligations, not that it was unwilling to.

Finally, in reaction to a United States district court decision rendering a default judgment against the PRC for certain defaulted bonds not including the 1913 bonds, *see Jackson v. PRC*, 550 F. Supp. 869 (N.D. Ala. 1982), the PRC in 1983 sent a diplomatic *Aide Memoire* to the United States stating that "[t]he Chinese government recognizes no external debts incurred by the defunct Chinese governments and has no obligation to repay them."[6]  (Pietrzak Decl. Ex. 13 ¶ 2.)  Plaintiffs now bring suit to enforce the obligations of the 1913 bonds against the PRC.

## STANDARD OF REVIEW

Defendant moves to dismiss the complaint under Rule 12(b)(1) on the grounds that the Court lacks subject matter jurisdiction to hear the case because the PRC is immune from this lawsuit as a sovereign nation.  In the context of a Rule 12(b)(1) challenge to jurisdiction under the FSIA, the Court must look to the substance of the allegations to determine whether one of the exceptions to the FSIA's general grant of immunity applies. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).  "[T]he plaintiff has the burden of going forward with showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (citations omitted).  The Court should look outside the pleadings to submissions by the parties when there are disputed factual issues.  *See Filetech S.A. v. Fr. Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991) (on a motion "challenging the district court's subject matter

---

[6] The PRC asserted as "a long-established principle of international law that odious debts are not to be succeeded to" (Pietrzak Decl. Ex. 13 ¶ 2), a view they continue to advance, but do not explicitly rely on, in making this motion to dismiss.  (Mot. to Dismiss 1 n.1.)

jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits").

Defendant also moves to dismiss the complaint as time-barred under the applicable statute of limitations. "Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss[, which] is properly treated as a Rule 12(b)(6) motion to dismiss." *Ghartey v. St. John's Queens Hosp.,* 869 F.2d 160, 162 (2d Cir. 1989). "[S]uch a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (citations and internal quotation marks omitted). The Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted). The Court may not look outside the complaint and "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).

## DISCUSSION

### A.   Foreign Sovereign Immunity

Until 1952, the United States held the official view that foreign sovereigns were absolutely immune from suits in the courts of the United States. At that time, the executive branch adopted a restrictive theory of immunity, under which a state would be granted immunity only for its sovereign or public acts. *See* Letter from Jack B. Tate,

Acting Legal Adviser, to Philip B. Perlman, Acting Attorney General (May 19, 1952). This view was codified by the Foreign Sovereign Immunities Act ("FSIA") in 1976, now the sole means of obtaining jurisdiction over a foreign sovereign in the United States. 28 U.S.C. §§ 1330, 1602–11 (2006); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (FSIA applies to lawsuits based on claims arising before its passage as well). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts" unless one of the enumerated exceptions apply. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).[7]

Plaintiff invokes the "commercial activity" exception to a foreign state's immunity, which provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). In particular, plaintiff contends that the PRC is subject to suit under the third clause. For a foreign state to be subject to jurisdiction under the third clause, the lawsuit must be (1) "based . . . upon an act outside the territory of the United States"; (2) "that was taken in connection with a commercial activity of [the foreign state] outside this country"; and (3) "that caused a direct effect in the United States." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992).

---

[7] To challenge subject matter jurisdiction under the FSIA, the defendant must first present a "prima facie case that it is a foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993). It is undisputed here that the PRC is a foreign sovereign.

7

The parties do not dispute that the first two factors are established.  First, a lawsuit is "based upon" conduct that, "if proven, would entitle a plaintiff to relief under his theory of the case."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (U.S. 1993).  In this case, the legally significant act was the PRC or its predecessor's default on plaintiff's bonds.  The prior government of China ceased paying interest on the bonds in 1939.  Under the terms of the bonds, all payments of principal and interest were to be made in Britain, Germany, France, Russia, or Japan.  (Bond Conditions ¶ 5.)  Thus, the breach took place either in China where the decision to default was made or in one of the countries where payments were to be made, thereby satisfying the requirement that the acts occur outside the United States.  *See Weltover Inc. v. Republic of Argentina*, 941 F.2d 145, 153 (2d Cir. 1991), *aff'd* 504 U.S. 607 (1992) ("[t]he legally significant act was defendants' failure to abide by the contractual terms; i.e., to make payments in" the specified location).  The Court need not inquire further into where exactly the breach or failure to pay occurred, so long as it occurred outside the United States.  *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 311 n.30 (2d Cir. 1981) ("We need not belabor the point that the specific act or acts upon which these suits are based, the anticipatory repudiation of the cement contracts and letters of credit, took place at least in part 'outside the territory of the United States.'").  Second, the breach of the terms of the bonds was in connection with the issuance of the bonds, which has been held to be a "commercial activity" within the meaning of the FSIA.  *See Weltover*, 941 F.2d at 151 ("the issuance of debt instruments . . . is clearly commercial"); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991) ("it is self-evident that issuing public debt is a commercial activity within the meaning of Section 1605(a)(2)").

8

Thus, the only question is whether there was a "direct effect in the United States." In conducting this inquiry, the Court should balance "Congress' goal of opening the courthouse doors 'to those aggrieved by the commercial acts of a foreign sovereign,'" *Weltover*, 941 F.2d at 151 (citing *Texas Trading & Milling Corp.*, 647 F.2d at 312), with the requirement of "some form of substantial contact with the United States," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 490 (1983). The Court finds that there was no direct effect in the United States, and thus the PRC is entitled to sovereign immunity.

### 1.  **Absence of a "Direct Effect"**

As an initial matter, the Court questions whether the 1939 default on interest or the 1960 default on principal had *any* effect on plaintiff who likely purchased the long-defaulted bonds for a few hundred dollars in a "collectibles" market in 2000. Plaintiff describes the effect as follows: "Mr. Morris has not been paid what he is owed by Defendant." (Opp'n 5.) Financial loss arising from a breach of contract can constitute an effect. *See Texas Trading & Milling Corp.*, 647 F.2d at 312 ("a direct effect can arise not only from a tort, . . . but from [a breach] of a contract . . . as well").[8] However, plaintiff has presented no evidence showing any loss in this case. While plaintiff alleges that he purchased the bonds in 2000 (Compl. ¶ 38), he does not provide any more details about the nature of the transaction. If he purchased the bonds (priced) as collectibles, and not as legitimate financial instruments,[9] then it can hardly be considered a financial loss when he

---

[8] The court in *Texas Trading* was referring to a corporation when it found that financial loss constituted a direct effect. *See Texas Trading & Milling Corp.*, 647 F.2d at 312 (determining financial loss to corporation constitutes direct effect because "[u]nlike a natural person, a corporate entity is intangible; it cannot be burned or crushed. It can only suffer financial loss."). Where the affected party is a natural person, it is slightly less obvious that financial loss, rather than actual injury, should constitute an effect for purposes of the FSIA. To the extent there is any doubt, however, the Court finds this to be the case.

[9] In this regard, defendant points the Court to several cases in which the SEC has obtained civil injunctions preventing the sale of ancient bonds as anything other than collectibles. *See* SEC Litigation Release No. 15989 (Dec. 1, 1998); SEC Litigation Release No. 18393 (Oct. 6, 2003).

9

receives exactly what he paid for.[10]  A party who purchased the bonds as financial instruments has a more tenable claim to have suffered an "effect" in a commercial sense as envisioned by the FSIA.

Assuming plaintiff has suffered some injury, he has not made a showing of a "direct effect" as required by the statute.  "[A]n effect is direct if it follows as an immediate consequence of the defendant's legally significant act."  *Weltover*, 504 U.S. at 618 (citations and internal quotations omitted).[11]  Plaintiff purchased his bonds over sixty years after the PRC's predecessor government defaulted in 1939 and forty years after the bonds matured.  Such an effect lacks the immediacy required for this exception to sovereign immunity to apply.  Before plaintiff suffered an effect, he first had to purchase the bonds, an intervening act.  A line of cases interpreting "direct effect" in the context of tort liability has found that an intervening act, or an extended causal chain, can keep an effect from being characterized as direct.  *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 237 (2d Cir. 2002) (concluding that there was no jurisdiction where the "effect" was dependent on an intervening factor); *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994) (same); *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978) ("The common sense interpretation of a 'direct effect' is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.").  While this case sounds in contract and not in tort, the Court nonetheless finds that plaintiff's act of purchasing the bonds many decades after default likewise is an intervening act breaking the causal relationship.  The "direct effect"

---

[10] Indeed, the bonds that are the subject of this case can currently be purchased over eBay.  At the time of publication, the £20 bond was selling for $100 and £100 bond was selling for $500.

[11] The Supreme Court, resolving a split among the circuits, has explicitly held that for an effect to be considered "direct," it need not be "foreseeable" or "substantial."  *Weltover*, 504 U.S. at 618.

from the legally significant acts, the breaching of the terms of the bonds, was felt in 1939 and 1960, not in 2000 when plaintiff purchased and the defaulted bonds in a "collectibles" market.

Nothing in the commercial activity exception expressly limits cognizable effects to those felt solely by plaintiff.[12]  Thus, plaintiff could arguably rely on the effect felt by the former holders of his bonds.  The default on plaintiff's bonds, in either 1939 or 1960, would cause a direct effect to those people who held plaintiff's bonds at the time of default.  *See Weltover*, 941 F.2d at 152 ("Because defendants' breach of the [bond] agreement deprived plaintiffs of their contractual rights to receive payment, defendants' acts caused a direct effect to plaintiffs.").  If plaintiff alleged that U.S. citizens held his bonds at the time of any default, the Court would then have to consider whether citizenship was sufficient to place the direct effect "in the United States," discussed *infra*.  However, plaintiff has not put forward any evidence regarding the provenance of the eight bonds he now holds, nor does he allege that antecedent owners were U.S. citizens who suffered direct effects in the United States.  At most, he makes the conclusory allegation that bonds were sold at an unspecified time to and in the United States.  (Compl. ¶¶ 18, 19.)

### 2. Absence of a Direct Effect "in the United States"

Even if plaintiff established that U.S. citizens held his bonds at the time of any default, or that his purchase of the bonds in 2000 somehow gave rise in some other manner to a "direct effect," he must still show that the direct effect was felt "in the United States." Plaintiff argues that the Court should focus entirely on the citizenship of the bondholder in

---

[12] For example, in *Commercial Bank of Kuwait v. Rafidain Bank*, the defendant was to make payments not directly to plaintiff, but to U.S. accounts held by third-party banks.  15 F.3d 238, 241 (2d Cir. 1994).  The Court rejected defendant's argument that the commercial activity exception did not apply because the withheld payments were not to be made to plaintiff, and held that the failure to "remit funds in New York . . . had a direct effect in the United States." *Id.*

11

considering where the effect was felt.  Certainly, one factor in evaluating where financial loss is felt is where a corporation is incorporated, or analogously, where a natural person resides.  *See Texas Trading & Milling Corp.*, 647 F.2d at 312 (finding financial loss occurred "in the United States" for two reasons, one of which was that "each of the plaintiffs is an American corporation"); *Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903, 907 (S.D.N.Y. 1986) (finding "direct effect in the United States" where "the beneficiary of the contract" was "a New York corporation"); *cf. Int'l Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11 (2d Cir. 1989) ("the fact that IHL is a foreign corporation is relevant to whether the financial losses to IHL constituted a 'direct effect' in the United States").

Furthermore, the Second Circuit has suggested, in dicta, that financial loss by a corporation from a breach of contract might be sufficient to locate a "direct effect" in its place of incorporation.  *See Weltover*, 941 F.2d at 152 ("a foreign sovereign's improper commercial acts cause an effect to the foreign corporate plaintiff in that plaintiff's place of incorporation or principal place of business").  More recently, however, the Second Circuit has found the theory that "any U.S. corporation's financial loss constitutes a direct effect in the United States [to be] plainly flawed." *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 240 (2d Cir. 2002); *see also Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 255 n.8 (S.D.N.Y. 1993) ("As a general matter, . . . 'mere financial loss' suffered by a person, whether individual or corporate, in the United States is not, in itself, sufficient to constitute a 'direct effect.'" (citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 710 (9th Cir. 1992))).  In so holding, the court relied, in part, on a case involving a foreign tort committed against a U.S. corporation where the court declined

12

to find a "direct effect in the United States" based simply on plaintiff's place of incorporation. *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993) (contrary holding would "result in litigation concerning events with no connection with the United States other than the citizenship or place of incorporation of the plaintiff"). The *Virtual Countries* court also found that a sole focus on the place of incorporation would "render superfluous the analysis, followed by every circuit court of which we are aware that has addressed this question, of the locus of contractual obligation when deciding whether a direct effect occurred in the United States under the FSIA." 300 F.3d at 240. And while this observation was made with reference to a corporate plaintiff, the court explicitly stated that its reasoning was equally applicable to plaintiffs who were natural persons.[13]

Plaintiff simply ignores the court's analysis in *Virtual Countries* and relies instead on the Second Circuit's earlier decision in *Texas Trading*, which found a direct effect in the United States where the place of performance was in the U.S. and the plaintiff corporation was domestic. 647 F.2d at 312. However, the *Virtual Countries* court explicitly addressed this aspect of the *Texas Trading* decision and found that it was the place of performance that located the effect "in the United States" and satisfied the jurisdictional requirements of the FSIA. 300 F.3d at 239 ("Satisfaction of the geographical nexus in *Texas Trading* depended on the fact that the contract stipulated performance in New York, not on plaintiffs' corporate form.")

---

[13] Thus, the courts noted: "Every circuit court of which we are aware that has addressed this issue has held—without reference to whether the plaintiff was a corporation, a non-corporate business entity, or a natural person—that an anticipatory contractual breach occurs "in the United States" for the jurisdictional purposes of § 1605(a)(2) if performance could have been required in the United States and then was requested there." *Virtual Countries*, 300 F.3d at 239-40 (citations omitted).

13

To the extent tension exists between *Virtual Countries* and *Texas Trading*, the Court finds no need to seek a resolution. Neither case supports the proposition advanced by plaintiff that a financial loss to a plaintiff (individual or corporate) by virtue of its residence or place of incorporation is itself sufficient to establish a direct effect "in the United States" when all other facts point abroad. In the case before us, the *only* evidence of a nexus with the United States clearly presented to the Court is plaintiff's citizenship, coupled with his purchase of eight bonds over sixty years after they went into default. There is no evidence before the Court of prior ownership of plaintiff's bonds by U.S. citizens or corporations at the time of any default. No issuing banks were located in the United States, as a result of President Woodrow Wilson's explicit decision not to support domestic bank's role in the issuance of the bonds. The PRC had no designated agent to administer the bonds in the United States. No negotiations concerning the bond issuance or payment occurred within the United States. The bonds were not issued or payable in U.S. currency. And, importantly, the contractually designated locations where payments of principal and interest were to be paid were all in cities outside the United States. Considering all the factors, the Court concludes that plaintiff suffered no "direct effect in the United States" sufficient to establish jurisdiction under the commercial activity exception of the FSIA.[14]

---

[14] Plaintiff also clearly fails the "legally significant acts" test referred to in *Virtual Countries*, which requires that legally significant conduct, in this case the failure to make designated payments, take place in the United States. 300 F.3d at 240–41. Here, payment of interest and principal was explicitly and exclusively designated to be made in cities outside the United States. (Bond Conditions ¶ 5.) Plaintiff attempts to argue that because the bonds on their face were payable directly to the bearer, payment could have been had in the United States, perhaps if the issuing banks were gone. The Court will not engage in such speculation. *Cf. Croesus EMTR Master Fund L.P. v. Brazil*, 212 F. Supp. 2d 30, 37 (D.D.C. 2002) ("Thus the Court is left with mere conjecture—that if plaintiffs had presented the Bonds for payment, they would have designated the United States as the place for payment . . . [and] would 'likely' agree to plaintiffs' designation. This scenario is too full of contingencies to support the conclusion that payment was 'supposed' to have been

B.     **Statute of Limitations**

Even if plaintiff established subject matter jurisdiction under the FSIA, the Court would still dismiss this action as untimely. When a claim is brought under the FSIA, the law of the forum state determines whether plaintiff's claim is time-barred. *See Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 388 (S.D.N.Y. 2000). A federal court sitting in New York will apply New York's "borrowing statute," N.Y. C.P.L.R. § 202, to determine what statute of limitations to apply. *See id.* at 388–89. Under § 202, where a non-resident sues based upon a cause of action that accrued outside New York, the Court will apply the shorter limitations period of either New York or the location where the action accrued. The Complaint only specifies that plaintiff is a citizen of the United States (Compl. ¶ 1); however, both parties agree that the New York limitations period applies. The New York statute of limitations for bringing "an action upon a contractual obligation or liability" is six years. N.Y. C.P.L.R. § 213(2); *see also Town of Brookhaven v. MIC Prop. & Cas. Ins. Corp.*, 668 N.Y.S.2d 37, 38 (N.Y. App. Div. 1997) (applying CPLR 213(2) to action to recover on bond); *Dar El-Bina Eng'g & Contracting Co.*, 79 F. Supp. 2d at 389 (S.D.N.Y. 2000) (same).[15]

The limitations period begins to run "on each [interest] installment from the date it becomes due" and on recovery of the principal from the day after the bond matures. *See*

---

made in the United States."). The banks are not all gone and the contractually designated places of payment are all outside the United States.

[15] Plaintiff argues instead that the action is governed by a 20-year limitations period under N.Y. C.P.L.R. § 211(a). That limitations period applies to "[a]n action to recover principal or interest upon a written instrument evidencing an indebtedness of the state of New York or of any person, association or public or private corporation, . . . secured only by a pledge of the faith and credit of the issuer." *Id.* First, defendant is not the state of New York, a natural person, or an association or corporation. Second, while the Chinese government "pledge[d] its good faith and credit for the punctual payment of the said principal and interest," the entire loan was also secured "upon the entire revenues of the Salt Administration of China" and "certain Central Government taxes of the [specified] Provinces." (Bond ¶ 1; Bond Conditions ¶ 3.) *See Vigilant Ins. Co. v. Hous. Auth.*, 660 N.E.2d 1121, 1124 (N.Y. 1995) (holding § 211(a) to be inapplicable where bond was not secured "only" by full faith and credit of issuer).

*Vigilant Ins. Co. v. Hous. Auth.*, 660 N.E.2d 1121, 1125–26 (N.Y. 1995). Absent tolling, plaintiff's claims for defaulted interest coupons (post-1939) would be time-barred six years after payment on each interest coupon could be demanded. *See Mundaca Inv. Corp. v. Rivizzigno*, 668 N.Y.S.2d 854, 855 (N.Y. App. Div. 1998) ("[A] cause of action accrues for the purpose of setting the statute in motion as soon as the creditor, by his own act, and in spite of the debtor, can make the demand payable." (citing *Knapp v. Green*, 29 N.Y.S. 350, 351 (N.Y. App. Div. 1894))). Plaintiff's claim for the principal upon maturity would be time-barred six years after the bonds reached maturity in 1960. To be entitled to any recovery, plaintiff must therefore show that the statute of limitations was continuously tolled from at least 1966 until no more than six years before the present action.

Plaintiff's primary argument for tolling is that no court could hear his claim until recently and that, as a matter of equity, a statute of limitations ought to be tolled where one is disabled from suing on that claim by a "superior power." (*See* Opp'n 13–14 (citing *Braun v. Saverwein*, 77 U.S. 218, 222–23 (1869).) *See also Oswego & Syracuse R. Co. v. State*, 124 N.E. 8 (N.Y. 1919) (statute of "limitations are suspended when there is no tribunal competent to adjudge."). Plaintiff offers no less than seven "superior powers" that precluded suit on the bonds. Even viewing plaintiff's "superior powers" argument generously, it is still inadequate to make his claim timely. Plaintiff claims that both World War II and the Communist Revolution in China prevented courts from hearing this claim. Without evaluating the validity of that contention, the Court simply notes that both events had run their course by 1949 and hardly justify a further 56-year delay in the filing of an action. Plaintiff next complains of the American government's prior policy of granting sovereigns absolute immunity with no exception for commercial activity.

16

However, plaintiff concedes that the United States adopted a restrictive theory of immunity with the issuance of the Tate Letter in 1952 at which time this "superior power" ceased to be a bar to action. The same may be said of plaintiff's argument that suit could not be bought in a federal court while the PRC was a non-recognized government.[16] The PRC was formally recognized in 1979 and plaintiff concedes that thereafter the PRC had sufficient contacts to allow for personal jurisdiction over it. (Opp'n 15.) Even if plaintiff is correct, his action would still be time-barred by the mid-1980s.

Plaintiff next argues that even if there was personal jurisdiction over the PRC, there was no way to effect service until China became a party to the Hague Service Convention in 1991 and that this was one more "superior power" precluding the instant litigation and tolling the statute. This argument is wide of the mark: the Convention simplified and expedited service of judicial documents on foreign citizens; becoming a party to it did not for the first time permit the signatory government to be served. The FSIA itself provided a means of service since passage in 1976, 28 U.S.C. §§ 1608(a), (b). Even prior to the passage of the FSIA, federal courts had the power to provide for service of process on sovereigns in appropriate circumstances. *Petrol Shipping Corp. v. Kingdom of Greece*, 360 F.2d 103, 109-10 (2d Cir. 1966) ("the fashioning of provisions with respect to service on foreign governments is a task peculiarly appropriate for federal courts").

Finally, plaintiff argues that the FSIA was not retroactive when it was passed and did not become retroactive until the Supreme Court so found in *Republic of Austria v.*

---

[16] The one case cited by plaintiff for this proposition, apart from concerning a foreign country's right to sue in U.S. courts as opposed to whether it could be subject to suit, went on to hold that rights (and analogously, liabilities) were vested in a state rather than any particular government. *See Guaranty Trust Co. of N.Y. v. United* States, 304 U.S. 126, 137 (1938). Thus, even if the PRC could not, in fact, have been sued prior to being formally recognized by the United States, claims based on plaintiff's bonds could still have been brought against the formally recognized Republic of China.

*Altmann*, 541 U.S. 67 (2004).  Of course, the Supreme Court did not *make* the FSIA retroactive; it so construed the statute finding "clear evidence that Congress intended the Act to apply to preenactment conduct."  541 at U.S. 697.  Thus the FSIA was in fact retroactive from the moment it became law and allowed suit on this claim no later than 1976.  Indeed, bondholders did not have to wait until 1976, much less 2004, to file suit since the commercial activity exception to sovereign immunity had been applied since the 1952 Tate Letter to sovereign commercial conduct that predated the letter.  *See Altmann*, 541 U.S. at 696 n.16 (noting that between 1952 and 1976, courts presumed that the "Tate Letter was applicable even in disputes concerning conduct that predated the letter" (citing *Nat'l City Bank of New York v. Republic of China*, 348 U.S. 356, 361 (1955))).  Thus, claims based on the non-payment of plaintiff's bonds were stale well before the passage of the FSIA.

      Moreover, there is no indication that the Supreme Court meant to suggest much less hold in *Altman* that the passage of the FSIA restarted the statute of limitations on otherwise stale claims.  Indeed, Justice Breyer writing a concurring opinion addressed the dissent's concerns that retroactive application of the FSIA would create a flood of litigation by noting that statutes of limitation would greatly curtail the number of viable claims.  541 U.S. at 713 (Breyer, J., concurring).  And, the Second Circuit directly held, albeit before *Altmann*, that passage of the FSIA did not result in "wholesale reactivation of ancient claims" barred by the statute of limitations.  *Schmidt v. Polish People's Republic*, 742 F.2d 67, 71 (2d Cir. 1984).

      In sum, it is clear that foreign governments could be subject to suit since the issuance of the Tate letter in 1952 and that the commercial activity exception would have

been available as a possible basis for jurisdiction regarding claims that pre- and post-date 1952. If plaintiff is correct that no court could entertain his claim against the PRC until it was officially recognized by the United States, then he is still only entitled to tolling into the 1980s. Plaintiff asserts no legitimate basis for tolling after that point. While this suit may have fared no better in the 1980s than it does here, there were certainly courts competent to hear the claim. Therefore, the statute of limitations has expired and plaintiff's claim is time-barred.

## CONCLUSION

For the foregoing reasons, the PRC's motion to dismiss [14] is granted and Morris's Complaint [1] is dismissed in its entirety. If and when service of process is effected in the action brought by plaintiffs Pons and Soria, both plaintiffs and the PRC may brief the court on why this judgment should or should not be imposed on that case as well.

SO ORDERED.

Dated: New York, New York
       March 21, 2007

_____
Richard J. Holwell
United States District Judge